NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 251295-U

NO. 4-25-1295

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 17, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| ANDREW D., | ) | Appeal from the |
|     Petitioner and Counterrespondent-Appellant, | ) | Circuit Court of |
|     v. | ) | Adams County |
| KAYLA M., | ) | No. 23FA49 |
|     Respondent and Counterpetitioner-Appellee. | ) | |
| | ) | Honorable |
| | ) | Christopher W. B. Pratt, |
| | ) | Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court.
Justices Doherty and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed, concluding petitioner and counterrespondent had not established any error related to the trial court's decision to restrict his parenting time.

¶ 2    Petitioner and counterrespondent, Andrew D., appeals the trial court's judgment restricting his parenting time with his son, E.M. (born in December 2018). On appeal, Andrew argues the court erred when it allowed and relied upon hearsay in reaching its decision to restrict parenting time and, without said evidence, the court's decision cannot stand. Andrew also argues the court was not impartial, improperly acted as an advocate for respondent and counterpetitioner, Kayla M., the minor's mother, and improperly decided the matter prior to hearing all the evidence. For the reasons that follow, we affirm the court's judgment.

¶ 3                                I. BACKGROUND

¶ 4    Over a three-day hearing, the parties, each of whom were duly represented,

presented evidence on various matters related to their son. The transcript from the hearing is more than 550 pages. A guardian *ad litem* (GAL) report, which was also presented at the hearing, is 26 pages. Despite raising issues on appeal which are heavily fact dependent, Andrew presents this court with an opening brief that contains a four-paragraph statement of facts, spanning less than a page. Kayla, after challenging the sufficiency of Andrew's statement of facts in her appellee's brief, provides a more thorough statement of facts. After reviewing the briefing and the record, we glean the following from the hearing as it relates to the issues presented in this appeal.

¶ 5    Between 2019 and 2023, the parties shared equal and unrestricted parenting time with the minor. Around the middle of 2023, Andrew began making reports of abuse and neglect of the minor by Kayla and her family. The reports were based upon statements made by the minor and marks seen on his body. The reports were investigated by the Illinois Department of Children and Family Services (DCFS), and the minor participated in interviews with the child advocacy center. Andrew acknowledged the reports were later returned as unfounded. The GAL testified Andrew provided her with multiple photographs of the marks seen on the minor's body. The GAL characterized the marks as those typically found from normal childhood play. The GAL believed Andrew often overstated injuries to the minor. The GAL also believed it was harmful to the minor for Andrew to repeatedly document the injuries or marks on the minor's body.

¶ 6    In August 2023, Andrew filed a petition for an emergency order of protection against Kayla, which the trial court denied upon finding it was "an attempt at an end run around" of a prior order entered in this case. Andrew then filed a similar petition in an Iowa court, which was granted. The trial court learned of the Iowa order and contacted the Iowa court. The Iowa order was voided. Andrew denied Kayla her parenting time with the minor during this period.

¶ 7    According to a sheriff's deputy who testified at the hearing, in early September

2023, Kayla's husband was being investigated by his employer, the Army, based upon an anonymous report it received that he was sexually abusing Kayla, the minor, and the minor's stepsiblings. The sheriff's deputy also testified she learned through a DCFS caseworker that Andrew reported knowing of the investigation. No charges were pursued from the investigation.

¶ 8        In late September 2023, Kayla made a report alleging sexual abuse of the minor by Andrew. The report was based upon statements made by the minor. The report was investigated by DCFS and later returned as unfounded. The GAL testified the minor made statements disclosing the abuse to multiple individuals.

¶ 9        The trial court ordered Andrew's parenting time with the minor be restricted on a temporary basis. Specifically, the court ordered the parenting time be supervised. Andrew began attending supervised visits in November 2023. Between November 2023 and June 2024, Andrew would often question the minor about bumps or scratches on the minor's body. The questioning required intervention and redirection by the visitation specialist. The questioning was described by the specialist as inappropriate and incessant. During this time, the minor also made repeated reports of being injured by his stepbrothers. The specialist did not observe injuries consistent with the minor's reports.

¶ 10        Between June 2023 and March 2024, Andrew made multiple phone calls to law enforcement seeking wellness checks involving Kayla. The wellness checks were conducted, and no concerns were discovered. Law enforcement reported its findings to Andrew.

¶ 11        In April 2024, Andrew made a battery report in which the minor was the victim. The report was investigated. The sheriff's deputy who conducted the investigation observed a "small, superficial injury on [the minor's] back," which the deputy believed to be a "rug burn."

¶ 12        Also in April 2024, law enforcement received an anonymous report of drug activity

- 3 -

involving a firearm at Kayla's home, which was in a rural area where the next closest home was approximately half a mile away. Law enforcement investigated and, with the consent of Kayla, searched her property. At the time, children were present in the home. Law enforcement found no evidence of drug activity. The sheriff's deputy involved in the investigation, Deputy Phil Zimmerman, testified he found the anonymous report suspicious based upon his training and experience and the location of the reported drug activity. As a result, the report was investigated as a false report, and the report was tracked to a restaurant. Video footage was obtained from the restaurant. Deputy Zimmerman sought a warrant for Andrew's arrest, but no warrant was issued.

¶ 13        At the conclusion of the testimony of Deputy Zimmerman, the trial court inquired if the parties would object to it asking additional questions. Andrew, through his attorney, indicated he had no objection to the court asking "clarification questions." The following exchange then occurred:

"Q. Deputy Zimmerman, you've been a deputy for 11 years, you said?

A. Yes, Judge.

Q. And would you say it's fair to say that during those 11 years, there's been at least some regularity you may have received reports that you felt were not entirely truthful?

A. Yes.

Q. Okay. How many times would you say that has happened, ballpark estimate? Dozens? 100?

A. A lot.

Q. Okay. How many of those times would you believe that there is a lack of truth in a report that you receive do you seek out a warrant for making a false

- 4 -

report?

A. Depends on the seriousness of the accusations or the call in question.

Q. And so was there something unique about this situation that prompted you to seek out a warrant for that false report?

A. Yes. The involvement of—or the, I guess, reported information of somebody having a firearm, based on what that does for my response.

Q. And what does that do for your response?

A. It typically heightens our response and can lead to use of force.

Q. Well, so that can be dangerous to the individuals where you're responding to the call?

A. Correct.

Q. Where—and you said that when you arrived, there were children present?

A. That's correct.

Q. Okay. Do you know if—do you recall if [the minor] was present?

A. That, I can't say. I don't know."

¶ 14 Andrew, who testified, was examined by Kayla's attorney about the anonymous report of suspected drug activity on Kayla's property. First, Andrew testified he did not know anyone by the name of "Dwight Woodbury." When asked if he was familiar with the restaurant where the report was tracked to, Andrew testified, "I've been there to eat a few times." He also indicated he knew an employee at the restaurant. When asked when he was last at the restaurant, Andrew testified, "I don't think we've eaten there in a couple years." Andrew then admitted to making the anonymous report, specifically that he reported "there was a possible drug deal that

somebody told me that they seen going on at [Kayla's] home." When asked when he made the report, Andrew indicated it was sometime after September 27, 2023, but noted his memory was "fuzzy." On further examination about the report, he explained he received a phone call sometime before 7:30 a.m., while on his way to work. The caller refused to identify himself despite Andrew's inquiries, and Andrew's phone did not show the caller's phone number. The caller reported he "witnessed a drug deal at [Kayla's] house" and it involved "a possible firearm." Andrew arrived at his work, where he stayed for approximately 20 minutes. He then went to the restaurant to make an anonymous call to law enforcement. He did so because he was worried about "being accused of falsely calling 911." Later that day, he contacted his cell phone provider to see if he could obtain the caller's phone number and learned he was unable to do so. Andrew acknowledged he had never told anyone about receiving the anonymous call.

¶ 15　　　　The following exchange occurred at the conclusion of the redirect examination of Andrew by Andrew's counsel:

"THE COURT: Are you all done? Do you have any further questions or—

[ANDREW'S COUNSEL]: No, Your Honor. I just note the Court—I think I said something that was amusing to the Court or something.

THE COURT: No. I mean, if you want to inquire of the fact that [Andrew] had no memory of exactly when that happened aside from it was after September 27th of 2023. When [Kayla's counsel] was asking him and now when you ask him, he can tell you specifically what year and season it was. I find that curious and amusing to me. I mean, it's amusing in a sad, tragic way, given the circumstances of everything we're talking about. But I find it curious, I guess. It wasn't anything you said. It was [Andrew's]—some spark of memory when he's being questioned

by his attorney versus the other attorney. That's what I smiled about, and perhaps it was inappropriate and I shouldn't have, but I—I sometimes laugh in tragic circumstances as a way of coping.

> [ANDREW'S COUNSEL]: I respect that, Your Honor. I'm just trying to—
>
> THE COURT: All right. Do you have any further questions for [Andrew]?
>
> [ANDREW'S COUNSEL]: Well, if I may have just a moment, please.
>
> No, I don't have any further questions, Judge."

¶ 16    In June 2024, Andrew contacted law enforcement to report the minor was stabbed with a pencil. The visitation specialist acknowledged the minor made such a statement. The specialist also acknowledged observing scratches on the minor's body. The specialist, however, likened the scratches to injuries a child receives while playing outside, not the type of injury warranting a report.

¶ 17    Also in June 2024, the visitation specialist learned Andrew had been surreptitiously recording his supervised visits between November 2023 and June 2024. This was a violation of the agreed-upon parent contract and resulted in visits being temporarily halted.

¶ 18    In July 2024, law enforcement responded to a call at Kayla's property about the discovery of a firearm and drug items. A backpack was found in an outbuilding on the property. Inside the backpack were a shotgun, methamphetamine, and items used to manufacture methamphetamine. The sheriff's deputy who investigated the call, Deputy Caleb Eidson, testified, based upon his training and experience, the items appeared "staged." He noted the items used to manufacture methamphetamine were new, which was inconsistent with items typically found with a drug user or manufacturer. He also noted the items appeared to have been "wiped down" before being placed in the backpack. He observed the backpack had undisturbed dust on top of it and the

shotgun was rusted.

¶ 19        After Deputy Eidson was asked if Andrew was suspected of staging the items, Andrew's counsel objected, stating, "That, again, is just speculation on their part. We haven't heard anything that would indicate why anything would be [Andrew's]. All we've heard is there's some items out there." The trial court, in response, sustained the objection but indicated it would allow Kayla's attorney to lay additional foundation.

¶ 20        Deputy Eidson testified he was aware of several calls placed by Andrew for service at Kayla's property. He was also aware Andrew had been suspected of placing the anonymous April 2024 report of drug activity at Kayla's property. Deputy Eidson further testified about a possible connection between Andrew and the shotgun found at Kayla's property. He explained he traced the shotgun to its owner and then contacted that person. At that point, Andrew's counsel objected to whatever the owner reported as hearsay, which the trial court overruled. Deputy Eidson testified the owner indicated the shotgun was last at either his mother's residence or another property where his brother, Dwight Woodbury, had resided. Deputy Eidson investigated Woodbury and learned he had "a methamphetamine conviction." Deputy Eidson asked Kayla about Woodbury and, although she initially indicated she was not familiar with that name, she later reported she located a Facebook profile with that name and recognized the person as someone she saw when picking the minor up from Andrew's residence. She indicated Andrew told the minor to say goodbye to "Uncle Dwight" during the parenting exchange.

¶ 21        Deputy Eidson testified, based upon Andrew's prior calls for service, the suspicion that he placed the anonymous April 2024 report of drug activity at Kayla's property, and Andrew's possible connection with the shotgun, he suspected Andrew had some involvement in the contraband found at Kayla's property. Deputy Eidson acknowledged he did not know if

Woodbury, in fact, previously had possession of the shotgun. He also acknowledged he did not have probable cause to arrest Andrew based upon the information he had at the time.

¶ 22　　　　In August 2024, supervised visits recommenced between Andrew and the minor. The visitation specialist observed a decrease in the hypervigilance and inappropriate questioning of the minor by Andrew. The specialist also observed a decrease in reports by the minor. The specialist believed Andrew returned to visits "as though he did not have an agenda other than spending time with his child."

¶ 23　　　　The visitation specialist believed it was no longer necessary for the visits between Andrew and the minor to be supervised. The GAL disagreed. The GAL also believed the minor's statements about sexual abuse by Andrew warranted an order requiring him to complete a sex offender evaluation and any recommended treatment. The GAL acknowledged, however, the minor was not a reliable reporter.

¶ 24　　　　After considering the evidence and arguments presented, the trial court rendered an oral decision, followed by a written judgment. In its oral decision, the court characterized Andrew as "a clumsy and inept manipulator." It found his witnesses were largely not credible and, at times, were "blatantly lying." In its written judgment, the court stated:

> "[Andrew's] conduct has seriously endangered the emotional health of the parties' child. Specifically, the Court finds that there has been a pattern of manipulation and untruthfulness by [Andrew], including but not limited to facilitating the placement of a firearm and illegal contraband on [Kayla's] property, and for other reasons as more fully stated on the record."

The court also noted the following in its written judgment:

> "The Court expresses concern regarding possible sexual abuse of the minor child

by [Andrew]. However, the Court cannot make a finding of sexual abuse at this time. The Court strongly encourages [Andrew] to obtain a sex offender evaluation." The court ultimately ordered Andrew's parenting time with the minor to be supervised.

¶ 25    This appeal followed.

¶ 26                                   II. ANALYSIS

¶ 27    On appeal, Andrew argues the trial court erred when it allowed and relied upon hearsay in reaching its decision to restrict his parenting time and, without said evidence, the court's decision cannot stand. Andrew also argues the court was not impartial, improperly acted as an advocate for Kayla, and improperly decided the matter prior to hearing all the evidence. Kayla, in response, argues Andrew has not established any error.

¶ 28    As an initial matter, Kayla argues the statement of facts provided by Andrew in his opening brief fails to comply with our supreme court rules, in that it does not contain a sufficient summary of the facts for an adequate understanding of the case and the issues presented herein. Andrew, in reply, maintains his statement of facts "is very much sufficient as shown by the appellee brief itself" and "was written with the idea of being brief, and directly to the point, and directed to the issues raised in the appeal."

¶ 29    "The supreme court rules governing the form and content of appellate briefs are not mere suggestions but, rather, are mandatory and have the force of law." *In re Marriage of Reicher*, 2021 IL App (2d) 200454, ¶ 30. They exist to ensure our courts have an adequate understanding of the record and the arguments to address and resolve the issues presented. *Id.* Relevant here, Illinois Supreme Court Rule 341(h)(6) (eff. Oct. 1, 2020) requires an appellant's brief to include a statement of facts that "contain[s] the facts necessary to an understanding of the case, stated accurately and fairly without argument or comment, and with appropriate reference to the pages

of the record on appeal."

¶ 30    We agree with Kayla's assessment of the statement of facts provided in Andrew's opening brief. Again, Andrew raises issues on appeal which are heavily fact dependent. Despite raising such issues, his statement of facts is approximately one page in length, which we find to be wholly insufficient to adequately consider the issues presented. While it would be within our discretion to strike Andrew's brief and dismiss the appeal, we have, as previously indicated, elected to independently review the record to better understand the issues and, therefore, now turn to the arguments raised by Andrew. See *Colon v. Illinois Central R.R. Co.*, 2024 IL App (1st) 221841, ¶ 22 (recognizing the authority to strike an appellant's brief and dismiss an appeal because of an appellant's failure to provide an adequate statement of facts).

¶ 31    First, Andrew argues the trial court erred when it allowed and relied upon hearsay in reaching its decision to restrict parenting time and, without said evidence, the court's decision cannot stand. Specifically, he asserts the court's finding in its written judgment that he facilitated the placement of a firearm and contraband on Kayla's property was improperly based upon testimony that is "hearsay and speculation." He further asserts, "There was simply no properly admissible evidence that would support the court's finding."

¶ 32    Section 603.10(a) of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/603.10(a) (West 2024)) allows for the restriction of parenting time due to a parent's conduct. See, *e.g.*, *In re Marriage of Mayes*, 2018 IL App (4th) 180149, ¶ 55. It states:

> "(a) After a hearing, if the court finds by a preponderance of the evidence that a parent engaged in any conduct that seriously endangered the child's mental, moral, or physical health or that significantly impaired the child's emotional development, the court shall enter orders as necessary to protect the child." 750

ILCS 5/603.10(a) (West 2024).

Orders necessary to protect a child include orders of supervision. *Id.* § 603.10(a)(2).

¶ 33     We find Andrew has not established any error related to the grounds upon which the trial court found it was necessary to restrict his parenting time. Andrew challenges the court's finding that he facilitated the placement of the firearm and contraband on Kayla's property. Andrew's challenge is unpersuasive. First and foremost, the court made clear its decision to restrict Andrew's parenting time was not solely conditioned upon this finding. The court stated its decision was based upon "a pattern of manipulation and untruthfulness by [Andrew], including *but not limited to* facilitating the placement of a firearm and illegal contraband on [Kayla's] property." (Emphasis added.) Second, assuming Andrew's challenge is based upon the testimony connecting him to the firearm (an assumption we make given the lack of clarity of Andrew's argument), we find, even if we exclude that testimony, the other evidence is more than sufficient to support the court's finding of Andrew's involvement. The other evidence showed (1) law enforcement received an anonymous report of drug activity involving a firearm at Kayla's home, (2) a firearm and contraband consistent with the anonymous report were found months later in an outbuilding on Kayla's property, (3) the items found on Kayla's property appeared staged, (4) Andrew admitted to making the anonymous report, and (5) Andrew's explanations of how he received the information for the report and why he made the report from a restaurant were suspicious. In sum, Andrew has not established error.

¶ 34     Next, Andrew argues the trial court was not impartial, improperly acted as an advocate for Kayla, and improperly decided the matter prior to hearing all the evidence. In support, he cites the exchange in which the court noted it sometimes laughs in tragic circumstances, the court's examination of Deputy Zimmerman, and the court's comments about Andrew's witnesses

- 12 -

when rendering its oral decision.

¶ 35 A litigant is entitled to an impartial judge who decides the matter after hearing all the evidence. See *Easter House v. Department of Children & Family Services*, 204 Ill. App. 3d 312, 315 (1990) ("Due process of law presupposes a fair and impartial hearing before a fair and impartial tribunal."). A litigant is also entitled to a judge who does not act as an advocate for the opposing party. See *In re Tamesha T.*, 2014 IL App (1st) 132986, ¶ 27 ("[A] judge *** may not assume the role as an advocate for either party.").

¶ 36 We find Andrew has not established any error related to the trial court's performance when presiding over this case. First, our review of the record does not show the court was not impartial or decided the matter prior to hearing all the evidence. With respect to the exchange in which the court noted it sometimes laughs in tragic circumstances, the court apparently had a visceral response to Andrew's testimony. After that response was raised by Andrew's attorney, the court acknowledged its response may have been inappropriate and indicated it stemmed from the differing recollections of Andrew depending on the examiner. While the court naturally found the differing recollections "curious," it did not indicate it decided the matter prior to hearing all the evidence. Indeed, it noted Andrew's attorney could examine Andrew on the matter. Further, with respect to the court's comments about Andrew's witnesses, those comments were an assessment of the witnesses' credibility at the close of evidence, which does not support a finding of a lack of impartiality. Second, our review of the record does not show the court acted as an advocate for Kayla. With respect to the court's inquiry of Deputy Zimmerman, the court's examination was to clarify the testimony and did not exceed its discretion. See *id.* (noting the wide latitude given to a trial judge in examining witnesses in a bench trial). In sum, Andrew has not established error.

¶ 37    As a final matter, Andrew raises additional issues in his reply brief, which we note is approximately the same length as his opening brief. Specifically, he asserts testimony from other deputies was hearsay and cannot support the trial court's decision to restrict his parenting time. He also asserts the court's mischaracterization of trial objections allowed the introduction of inadmissible testimony and establishes "bias." Because these issues were not raised in his opening brief, they are forfeited, and we decline to consider them. See Ill. S. Ct. R. 341(h)(7) (Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing.").

¶ 38    We conclude Andrew has not established any error related to the trial court's decision to restrict his parenting time. While Andrew may continue to assert that his actions throughout this case were well-intentioned and that he was not involved with the firearm and contraband found on Kayla's property, he must acknowledge the trial court has found otherwise. It is now Andrew's responsibility to make changes if he desires the restriction to his parenting time be modified or lifted. He would be well-served by seeking counseling and, as indicated by the trial court, undergoing a sex offender assessment. If he pursues counseling, it would be beneficial for his counselor to be provided with a copy of this decision. We encourage Andrew to continue with his recent efforts during the supervised visits with the minor.

¶ 39                        III. CONCLUSION

¶ 40    For the reasons stated, we affirm the trial court's judgment.

¶ 41    Affirmed.